# CASES

## DECIDED IN THE

# COURT OF APPEALS OF GEORGIA

### AT THE

## OCTOBER TERM, 1908.

---

### 1068.  PYLE v. THE STATE.

1. A ground of a motion for a new trial alleging error in admitting a written statement of the deceased as a dying declaration is without merit, unless it sets out in substance the written statement admitted. This court will not refer to the brief of evidence for the purpose of completing an incomplete assignment of error.

2. It was error to charge, on the subject of dying declarations that, "when a dissolution is approaching and the dead man has lost hope of life, and his mind feels the full consciousness of his condition, the solemnity of the scene gives to his statement the sanctity of truth." The instruction gives undue emphasis to the weight which the jury should give to such evidence.

3. The written request to charge on the subject of dying declarations contains the true rules as to the admissibility of such declarations as evidence, and how they should be considered and weighed when treated as evidence; and the court erred in not giving it in charge.

4. Where, on a trial upon an indictment for murder, the dying declarations of the deceased are introduced by the prosecution, it is error to exclude proof offered by the defendant of other statements made by the deceased, contradicting his dying declarations.

5. When tested by the verdict, the erroneous rulings clearly appear to have been harmless. The verdict, being manifestly based on other evidence, will not be set aside for errors as to evidence on which the jury plainly did not act.

6. Where some of the evidence, and inferences fairly deducible therefrom, tend to show voluntary manslaughter, a charge on that subject is not only proper, but demanded.

Conviction of manslaughter, from Early superior court—Judge Worrill.  February 8, 1908.

Argued June 9,—Decided October 12, 1908.

John Pyle was indicted for murder, and was convicted of voluntary manslaughter.  His motion for a new trial was overruled, and.

the writ of error challenges the correctness of this judgment. The motion for a new trial is based upon the general grounds and the following additional assignments of error: (1) That the court erred in admitting as evidence the paper purporting to be the dying declaration of the deceased, dated April 20, 1906, and signed T. W. Jackson, which is fully set out in the brief of evidence. It is insisted that the admission of this paper as a dying declaration was error, because the evidence did not show that it was made by Jackson, the deceased, in the article of death and after all hope of life had been extinguished. (2) That the court erred in the following portion of the charge on the subject of dying declarations: "When a dissolution is approaching and the dead man has lost hope of life and his mind feels the full consciousness of his condition, the solemnity of the scene gives to his statement the sanctity of truth, and such dying declaration, when made under such circumstances and conditions, may be admitted in evidence and considered by the jury." It is insisted that this is not the law as applicable to the weight of dying statements. (3) That the court erred in refusing to give the following timely written request: (a) "Dying declarations constitute one of the exceptions to the rule of hearsay evidence, the rule being that hearsay evidence is ordinarily rejected. Their admission is founded on the necessity of the case and the reason that, being made in view of impending death and judgment, when the hope of life is extinguished and the retributions of eternity are at hand, they stand upon the same plane of solemnity as statements made under oath. They are admissible only when made by a person in the article of death, and great caution is necessary in the use of this kind of evidence." (b) "You are to pass finally for yourselves on the question of whether the declarations were as the conscious utterances of the deceased in the apprehension and immediate prospect of death; and if not so made, you will not consider them." (c) "Great caution should be observed by the jury in the use of this kind of evidence. Such evidence is liable to be very incomplete, for the reason that the deceased may be disposed to give a partial account of the occurrence, although not influenced by animosity and ill will. And furthermore, the fact can not be concealed that animosity or resentment is not unlikely to be felt by the deceased in such a situation; and the passion of

anger, once excited, may not have been entirely extinguished even when all hope of life is extinct. Such considerations show the necessity of caution in receiving accounts given by persons in a dying state, especially when you consider that the party making the statement can not be subjected to the power of a cross-examination." (d) "The alleged dying statement of Jackson, the deceased, neither would be for your consideration if you believe the declarations were made at a time when he was not in the article of death or in extremis, or at a time when he had a hope of living, although that hope may have been slight."

(4) That the court erred in refusing to allow the defendant's counsel to prove by Dr. J. H. Crozier, who was then upon the stand testifying as a witness for the State, that Jackson told him that it was his purpose and intention to kill Pyle, that he would have done it if Pyle had not shot him in the mouth. Defendant now insists that this was legal and important testimony in his behalf, and that Crozier would have sworn so if the court had not ruled it out and refused to allow him to do so. Following this ground of the motion for a new trial is this note: "When counsel for defendant offered to ask Dr. Crozier the foregoing question, counsel for the State objected, unless his statement was offered as a dying declaration. Counsel for defendant stated that he did not offer it as a dying declaration, but as a statement made against him." (5) That the court erred in charging the jury on the subject of voluntary manslaughter, the defendant insisting that there was no evidence upon which to predicate this charge, as, under the evidence, he was either guilty of murder or was entirely justifiable, and that the charge complained of gave the jury an opportunity of rendering a compromise verdict. (6) That the court erred in the following portion of the charge: "The court charges you further to look into the matter and see whether or not the defendant was guilty of murder, or whether or not he was justifiable; but if you still believe that the act was done without malice and in a heat of passion arising from a mutual quarrel and mutual intention to fight upon the part of the defendant and the deceased, the court instructs you, if you believe that such were the conditions and you believe that both were armed at the time of the homicide, and there was a mutual intention to fight, and that under such conditions the defendant shot and

killed Jackson, then you would be authorized in finding him guilty
of voluntary manslaughter; and if such intention existed, both
intending to fight, it would make no difference who fired the first
shot, the killing under such conditions would be voluntary man-
slaughter." It is insisted, that the above charge was illegal and
not applicable to the case, the evidence failing to show any agree-
ment or intention on the part of Pyle to engage in mutual combat;
and that, therefore, this charge was calculated to mislead the
jury and injure the defendant.

*R. H. Sheffield, J. W. Walters,* for plaintiff in error.

*J. A. Laing, solicitor-general, J. E. Pottle, Pottle & Glessner,*
contra.

HILL, C. J. (After stating the foregoing facts.)

1. A well-settled rule of practice is not complied with in the
first special ground of the motion for a new trial. The written
statement objected to as a dying declaration is not literally or in
substance set out in the motion, nor is it attached thereto as an
exhibit. This court will look alone to the motion for a new trial,
and what is set out therein and made a part thereof, for the pur-
pose of determining whether the ruling complained of is erro-
neous. "Under no circumstances can an incomplete ground be
made complete by a reference to the brief of evidence." *Barker*
v. *State,* 1 *Ga. App.* 287 (57 S. E. 989); *Seaboard Ry.* v. *Phil-
lips,* 117 *Ga.* 106 (43 S. E. 494); *Spence* v. *Morrow,* 128 *Ga.* 722
(58 S. E. 356), and citations.

2. A statement made by the deceased, although admitted by
the court as a dying declaration and so found and treated by the
jury, has no greater force and effect than the testimony of a living
witness. Indeed, when this anomalous character of evidence is
properly considered, it is doubtful if it should have equal weight
with that of an unimpeached witness. As was said by Mr. Chief
Justice Lumpkin in *Campbell* v. *State,* 11 *Ga.* 375, "it must be
admitted that great caution should be observed in the use of
this kind of evidence." And in discussing this species of evidence
another great jurist has declared: "When a party comes to the
conviction that he is about to die, he is in the same practical
state as if called on in a court of justice under the sanction of an
oath, and his declarations as to the cause of his death are consid-
ered equal to an oath, but they are, nevertheless, open to obser-

vation. For though the sanction is the same, the opportunity for investigating the truth is very different, and, therefore, the accused is entitled to every allowance and benefit that he may have lost by the absence of the opportunity of more full investigation by the means of cross-examination." Alderson, B., in Ashton's case, 2 Lewin's Crown Cases, 147. This wise criticism has been quoted with approval by Mr. Justice Hall in his great opinion rendered in the case of *Mitchell* v. *State*, 71 *Ga*. 128, in discussing the unreliable and unsatisfactory character of such proof, and the undue influence that juries are almost sure to give it. In the language of Sir Walter Raleigh, "A dying man is ever presumed to speak the truth." And in the words of that mighty master of the human heart, Shakespeare (Richard II, act 2, scene 1), "The tongues of dying men enforce attention like deep harmony." To tell a jury, therefore, that they should give to dying declarations the "sanctity of truth" is to give undue emphasis to a kind of evidence which the human mind, whether through religious sentiment, or awe at the approach of the pallid messenger, or because the declarant, being at the point of death, "must lose the use of all deceit," is always prone to magnify. However unimpeachable might be the testimony of a living witness under oath, the court could not tell a jury that they should give it the sanctity of truth; nor should any greater weight be given to dying declarations. In the language of Mr. Justice Lumpkin, for the judge to so instruct the jury "is calculated to give undue emphasis to the weight to be attached to such evidence." *Robinson* v. *State*, 130 *Ga*. 361 (60 S. E. 1005). Nor do we think the undue emphasis thus given to the dying declarations was corrected or in any degree weakened by the remainder of the charge on the subject. *Mitchell* v. *State*, 71 *Ga*. 149.

3. The request to charge embraced in the third ground of the motion embodies the rules laid down by the Supreme Court in the *Mitchell* case, supra, on the weight of dying declarations and the cautious use which the jury should make of this kind of testimony. In short, the charge in full, as given, on the subject of dying declarations falls clearly within the adverse criticism of the Supreme Court in the *Mitchell* case, supra, and the request refused embodies substantially what the court there said should have been charged on that subject without request.

4. After the dying declaration had been admitted by the court, the defendant offered to prove contradictory statements made by the deceased after he was wounded, concerning the shooting. The court sustained the objection made to this testimony, and to this ruling the defendant excepted. It does not appear from the record on what ground the court based its ruling, unless, as explained in the note to this ground in the motion for a new trial, it was because the attorney for the defendant stated that he did not offer the contradictory statement as a dying declaration, but as a statement made against himself by the deceased. The rule is general that a witness may be impeached by proof that he has made statements contrary to what he has testified. It is true there is a condition to the application of this rule, which requires that the attention of the witness be previously called to the particular occasion and circumstances under which the supposed contradictory statements were made, in order to give him an opportunity of making any explanation of the matter which he may have. This preliminary condition can not be complied with where the contradictory statements offered are for the purpose of discrediting the testimony as to a dying declaration. Originally, at common law, dying declarations were only admitted ex necessitate rei, and while this ancient and, we think, salutary rule has been greatly relaxed by modern decisions, yet, as has been well said by Justice Blandford, "It can not be easily seen, if the dying declarations of the deceased, made ex parte in the presence of his own friends and relatives, and not in the presence of the accused or his friends, without a cross-examination, and testified to by his friends and relatives, are to be admitted against the accused from the necessity of the case, why the declarations of the deceased, after the mortal blow is given, to other persons and at other times, different from the dying declarations, should not be admitted in evidence to impeach the dying statement. If the one is admitted contrary to the general rule, why should not the other be likewise admitted? The former is admitted in favor of public justice, why not the latter in favor of life and liberty?" *Battle* v. *State,* 74 *Ga.* 104. If in the one case the witness who is to be impeached can not be given an opportunity to explain, in the other case neither can the accused have the benefit of the invaluable privilege of cross-examination; and the deprivation of the latter right probably works

greater injustice than the deprivation of the former; for while the loss of the one may destroy the character of the witness for veracity, the loss of the other may, in many instances, deprive the accused of his life or liberty. That public justice which treats every man alike, the living as well as the dead, and which has as much concern for the protection of the innocent as it has for the punishment of the guilty, demands that where proof of a dying declaration has been allowed against the accused, proof of a contradictory statement made by the declarant should be allowed in his favor. There can be no justice, therefore, in any rule which would deprive the accused, under such circumstances, of the right to impeach the credit of the deceased by proof of his having made contradictory statements as to the homicide and its cause. The contradictory statements offered to be proved in this case, and the circumstances under which they were made, were substantially similar to those in the case of *Battle* v. *State,* supra, which the Supreme Court ruled should have been allowed in evidence.

5, 6. While the instructions of the court and the rulings complained of to which we have referred in the foregoing division of this opinion were erroneous, yet, when tested by the verdict in this particular case, these errors were all harmless. An error of law which justifies the grant of a new trial should be an error resulting in injury; and no ruling, though it be erroneous when abstractly considered, ought to be sufficient ground for setting aside a verdict, unless in some appreciable degree such error contributed to the verdict. The verdict in this case was for voluntary manslaughter. It was in direct conflict with, and in the very teeth of, the dying declaration; and the rulings complained of, which we have held to be erroneous, all relate to the weight which the jury should give to a dying declaration as evidence. It is clearly apparent, from the verdict, that the jury gave no credence whatever to the statement of the deceased submitted as a dying declaration. Whether the jury in fact found that the written statement made by the deceased came up to the full legal requirements which entitled it to have the force and effect of evidence, or whether they believed that it did not speak the truth touching the homicide, is not apparent. It may have been that the jury did not find as a matter of fact that the written statement of the deceased fully measured up to the requirements of the law, so as to

make it testimony. There are some expressions, in the testimony of the able lawyer who wrote down this statement, which indicate that the deceased, when he made it, was not fully conscious of his condition, and, at the time that he made the statement, still entertained some hope of recovery. The positive, absolute conviction that death is certain is an essential before a dying declaration is evidence,—a certainty not limited by doubts or reserves. There must be a settled, hopeless expectation of death in the declarant. The deceased in this case declared, when making this statement, "He hoped to get well, but could not expect to get well, in view of his condition." But whatever may be the real truth touching this matter, it is, nevertheless, perfectly clear that the jury did not consider the alleged dying declaration at all, in making up their verdict; for it was impossible, legally speaking, if they gave any weight to the dying declaration as evidence, that the verdict could have been for any crime less than wilful, causeless assassination. Neither did the jury give any credence to the statement of the accused; for this statement, with all reasonable deductions therefrom, made a perfect case of justifiable homicide in self-defense. We must therefore look to the evidence of the witnesses who testified in the case, if we are to find any support for the verdict of voluntary manslaughter.

It is earnestly insisted, by the learned counsel for the plaintiff in error, that the evidence presents no middle ground; that the homicide was either murder or justifiable in self-defense. While we think, from a careful study of the evidence, that there is a very large preponderance of evidence in favor of the theory of the State that the crime of murder was committed by the accused, yet we find in this evidence some support for the conclusion at which the jury arrived. These final judges of the facts rejected alike the theory of the State and the theory of the defendant. They weighed all the evidence, accepted some portions of it as true, and discarded other portions as untrue. The jury found in the evidence the following facts: that the defendant and the deceased had been friends; that on the day of the homicide, and just shortly before the shooting took place, the deceased was at the home of the defendant, on his invitation, engaged there with other friends, as the defendant's guest, in social pleasure; that the deceased, without any provocation, and under the influence of

intoxicants, gave to the defendant what the defendant construed to be an insult both to himself and his family, and threatened to take the defendant's life; that the deceased left the home of the defendant, but the defendant, still rankling under the supposed insult, which was greatly magnified by his intoxicated condition, in a short time sought the deceased for the avowed purpose of securing from him an apology for his conduct, and, in a few minutes, found the deceased, and the difficulty was renewed and the shooting occurred; that both were armed and both were under the influence of intoxicating liquors. Whether the insult which the deceased had given to the defendant at his house was sufficient to justify the excitement of passion in the defendant, and whether the defendant had had sufficient cooling time before he again met the deceased, were all questions for the sole determination of the jury. Some of the facts show that there was a sudden quarrel, followed by a combat, in which both used deadly weapons, weapons which they already had in their possession and which they had not procured for the purpose of using in the combat. And because of the existence of these facts in the evidence, which the jury had the right to accept as the truth of the case, we think the court properly charged the law of voluntary manslaughter, and that the verdict for that offense is not without support in the evidence. *Gann* v. *State*, 30 *Ga.* 67; *McDuffie* v. *State*, 90 *Ga.* 787 (17 S. E. 105); *Fish* v. *State*, 3 *Ga. App.* 34 (59 S. E. 192).

*Judgment affirmed. Powell, J., disqualified.*