## JEFFERSON *v.* THE STATE.

1. When in a criminal case, after verdict, an attack is made upon a juror upon the ground that he was not impartial, the trial judge occupies the place of a trior, and his finding that the juror is competent will not be reversed, unless under all the facts the discretion of the judge is manifestly abused. No abuse of discretion appears in this case.

2. Certain grounds of the motion for new trial, in which exception was taken to expressions of the judge made pending the examination of witnesses, and others made while instructing the jury, were not subject to the criticism that they amounted to the expression of an opinion upon material facts in issue, or that they were otherwise prejudicial to the accused.

3. In the trial of a murder case, if at the time of making declarations the condition of the wounded party making them, the nature of his wounds, the length of time after making the declarations before he expired, and all the circumstances make a prima facie case that he was in the article of death and conscious of his condition when he made the declarations, such declarations are admissible in evidence

under proper instructions by the court to the jury, though the person may not have expressed his consciousness of impending dissolution.

4. Whether or not statements made about eight or ten minutes after deceased was shot, to the effect that the accused "shot him like a dog and kicked him in the face," were admissible as a part of the res gestæ, the admission of them was not cause for a new trial, in view of other evidence to the same effect which was afterwards introduced, some of which was introduced by the defendant.

5. In view of other evidence admitted, it was no cause for a new trial that the judge refused to allow a witness to testify that the prosecutor in the case, who was a witness for the State, had previously said: "He stated to me he wanted to hang him [meaning defendant] as high as a telegraph post."

6. There were numerous exceptions to the charge, but, considered in the light of the evidence and the charge in its entirety, none of them were sufficient to require the grant of a new trial.

7, 8. Several grounds of the motion for new trial complained of omissions to charge, and several of the refusals to charge upon request; but in the light of the charge as given and the evidence submitted, none of them were meritorious.

9. The alleged newly discovered evidence was not sufficient to require the grant of a new trial.

10. The evidence was sufficient to support the verdict, and there was no error in refusing to grant a new trial.

JANUARY 11, 1912.

Indictment for murder. Before Judge Gilbert. Muscogee superior court. July 24, 1911.

*S. B. Hatcher, J. H. Martin, A. W. Cozart, Ed. Wohlwender, S. T. Pinkston,* and *J. E. Sheppard,* for plaintiff in error.

*T. S. Felder,* attorney-general, *George C. Palmer,* solicitor-general, *T. T. Miller,* and *T. Hicks Fort,* contra.

ATKINSON, J. James Jefferson was indicted for the crime of murder. The person alleged to have been killed was Marion Marchant, a policeman in the city of Columbus. The implement employed by Jefferson in committing the homicide was a pistol. Immediately before the killing, Jefferson was seen standing in the front door of Thompson's near-beer saloon, fronting on Sixth avenue, talking to Marchant, who was standing out on the sidewalk facing him. No other witness testified to having heard the conversation, but Jefferson was seen suddenly to commence firing his pistol while standing in the door and to fire five shots in rapid succession, all taking effect and all passing entirely through the body except one, which passed through the arm. At the first shot, Marchant began falling face-forward, and when the shooting was

over was lying face-downward on the sidewalk, unable to move. After lying in that position for several minutes and calling for those coming to the scene to turn him over, he was lifted and carried into the saloon and laid on a pool-table. In about five minutes after he was shot he made certain statements to McPhail, a witness introduced by the defense, concerning the homicide, and about eight or ten minutes afterwards made other statements of the same character to J. T. Moore, the chief of police, and Moses Moon, a fellow policeman. The shooting occurred in the city of Columbus at about 7:30 o'clock on Wednesday evening, the 12th day of April, 1911. On Saturday following the shooting, he made to the solicitor-general a statement, telling who shot him, and giving other circumstances attending the shooting. The statement was reduced to writing, and on the following Monday morning submitted to him, and upon its being read over to him he said that it was correct. During the same morning he died. The doctor was with him at the time he made the statement, on Saturday, and testified as to the nature of his wound, and his opinion that Marchant could not recover, and that he was conscious and realized his condition, but he was not with him at the time the written statement was submitted to him on Monday. The chief of police, who was present on both occasions, testified as to Marchant's condition and appearance, and, upon the facts recited by him, stated that Marchant was conscious and obliged to know that he was in a dying condition. According to the statement of the accused, the policeman threatened to arrest him without cause, and upon being remonstrated with, threatened to blow a hole through him, and attempted at the time to draw his pistol; whereupon the accused drew his pistol and fired the five shots, Marchant endeavoring all the time to draw his pistol, but failing to do so. According to the statement of the deceased, Jefferson was drunk, and a few minutes before had been warned by him to go home, and after returning from up the street and finding him at this saloon he "got after him again," and Jefferson began shooting him without any provocation. At the first shot he fell, and Jefferson "stamped" him. After this he was shot while lying on the ground, but could not say how many times. The jury found the accused guilty, without recommending that he be punished by imprisonment in the penitentiary

for life, and the death penalty was imposed. A motion for new trial was refused, and the defendant excepted.

1. The fourth ground of the motion for new trial, being the first of the amended grounds, complained that one of the jurors who rendered the verdict "was not a fair and impartial juror, but he was incompetent and disqualified 'to serve as a juror in said case, he having said [on a given date], and before the trial of this case, that the defendant ought to be hung." As to this ground the trial judge occupied the position of a trior on the hearing of the motion for new trial. The evidence submitted upon the question was conflicting, and there was no abuse of discretion in overruling this ground of the motion. In such a case the Supreme Court will not control the discretion of the trial court, unless it clearly appears that it has been abused. *Bowdoin* v. *State,* 113 *Ga.* 1150 (6), 1151 (39 S. E. 478); *McNaughton* v. *State,* 136 *Ga.* 600 (71 S. E. 1038).

2. The fifth, tenth, eleventh, thirteenth, twenty-second, thirty-third, and thirty-fifth grounds complained that certain expressions of the judge used pending the examination of witnesses, and others made while instructing the jury, amounted to the expression of an opinion upon the facts, and were otherwise prejudicial to the accused. These grounds of the motion are lengthy, and it is unnecessary to set them out or elaborate upon them; but upon a careful consideration of each of them, we fail to find that the expressions of the judge were subject to the criticism that they contained intimations upon questions of fact at issue, or that the remarks of the judge or questions propounded by him to the witnesses, upon which error was assigned, were unfair or illegally prejudicial to the accused. Grounds nine, twenty-six, twenty-seven, twenty-eight, thirty-one, and thirty-four also, among other things, complained that the charge criticised in them expressed opinions of the judge on issues of fact; but none of them were subject to this criticism. Other criticisms upon the charge embodied in these grounds fall within the ruling announced in the sixth division of this opinion.

3. The sixth amended ground complained that the court illegally admitted in evidence a paper which the State contended constituted the dying declaration of the deceased, over the timely objection that before a paper as a dying declaration can go to the jury the State must show that the declarant was conscious of his

condition and in the article of death, and the evidence only showed that the paper was taken on Saturday and read over to the declarant on Monday a short time before his death, and failed to show that he was conscious of his approaching dissolution. Evidence was introduced as to the nature of the wounds, the physical condition of the deceased produced by them, and other circumstances, which, taken together, were sufficient to make a prima facie case that the deceased was in the article of death and conscious of his condition when he made the declarations which were admitted in evidence; and the court submitted them to the jury under appropriate instructions. It is not necessary to the admissibility of such a statement that the person whose statements are sought to be introduced as dying declarations should express himself as believing that he is in a dying condition. Consciousness of his condition may be inferred from the nature of the wounds or from other circumstances. *Barnett* v. *State*, 136 *Ga.* 65 (70 S. E. 868); *Perdue* v. *State*, 135 *Ga.* 277 (8), 278 (69 S. E. 184). There was no error in admitting the paper in evidence over the objection urged.

4. The seventh and eighth grounds of the amended motion for new trial complain of the admission in evidence of statements made by Marchant, after he was shot, to the effect that the defendant "shot him like a dog and stamped him in the face," the statements having been made separately to J. T. Moore, the chief of police, and to Moses Moon, a fellow officer. The objection urged to the admissibility of the evidence was that the statements were no part of the res gestæ, but were mere hearsay. The statements were made about eight or ten minutes after the wounds were inflicted. Whether or not these statements were admissible, their admission will not require a new trial, as statements to the same effect were contained in the written dying declaration of the deceased, which was properly admitted in evidence on the testimony of one of the witnesses to whom the alleged res gestæ statements were made. The other witness to whom the alleged res gestæ statements were made did not testify concerning the dying declarations; and were the issue close upon the point, it might make a difference, owing to the difference in the credibility of witnesses. But the issue was not close. McPhail, a witness introduced by the defendant, whose testimony went in without objection, testified that Marchant told him that the accused "shot him like a dog;"

also that when he approached Marchant, who was lying on the sidewalk, his head was bruised. The accused denied in his statement that he had stamped Marchant in the face, and McPhail testified to the same effect, but he was the only witness so testifying, and he did not pretend to account for the manner in which Marchant's head became bruised. Several other witnesses testified that the accused stamped Marchant in the face.

5. The question, "State what prosecutor, Chief J. T. Moore, said with reference to this case," was propounded to a witness for the accused. It was stated to the court that, if permitted to answer, the witness would testify, "He said to me he wanted to hang him [meaning defendant] as high as a telegraph post." It was also stated that the testimony was offered in order to show the prosecutor's feelings, and in order that the evidence might go to the credit of the prosecutor, who was a witness for the State. The court refused to allow the question and answer, and error was assigned upon the ruling. It appears that Moore had elsewhere testified that he was the prosecutor in the case, had aided in employing counsel to assist in the prosecution, and had taken great interest in the prosecution, and could not remember whether he had made the remark attributed to him as sought to be proved. Under these circumstances, the exclusion of the proposed evidence did not furnish ground for the grant of a new trial.

6. The twelfth, fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, nineteenth, twenty-first, twenty-third, twenty-fourth, twenty-fifth, twenty-sixth, twenty-seventh, twenty-eighth, twenty-ninth, thirtieth, thirty-first and thirty-second grounds of the amended motion complained of excerpts from the charge of the court. After a careful consideration of each of them in connection with the evidence and the charge in its entirety, none of them contained any error requiring the grant of a new trial, nor were they of such character as to require elaboration.

7. The twentieth amended ground complained that the judge erred in failing to define and charge "the different grades of homicide, including manslaughter and voluntary manslaughter." The thirty-eighth ground was substantially to the same effect. The forty-third ground complained that the judge erred in failing to charge the jury the law of voluntary manslaughter, and failed to charge sections 64 and 65 of the Penal Code of Georgia "there being evidence

to warrant the jury in finding the defendant guilty of voluntary manslaughter because the defendant killed the deceased upon a sudden heat of passion, and there being evidence to warrant the jury in believing that the deceased attempted to commit a serious personal injury on the defendant, or other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation or malice, either express or implied." The court gave the jury a concrete charge as to the law of voluntary manslaughter, in so far as that offense was involved in the case under either the evidence or the prisoner's statement. Therefore there was no merit in the ground of the motion for new trial complaining that the court failed to define voluntary manslaughter in accordance with sections 64 and 65 of the Penal Code.

8. The thirty-sixth amended ground complained that the judge refused to charge, on written request: "If the circumstances were sufficient to excite the fears of a reasonable man that he was in any serious danger and the serious danger was less than a felony, it would be voluntary manslaughter; if of a felonious assault, it would be justifiable homicide." The thirty-seventh ground complained that the judge refused to charge, upon written request: "If an assailant intends to commit a trespass only, to kill him is manslaughter; if he intends a felony, the killing is self-defense and justifiable." These requests did not give accurate statements of the law, and the principles sought to be stated in them were sufficiently covered by the general charge. The thirty-ninth ground complained that the judge refused to charge: "I charge you that great caution is necessary in the use of dying declarations; because, although there may have been an utter abandonment of all hope of recovery, it may often happen that the particulars of the violence of which the deceased has spoken occurred under circumstances of confusion and surprise, calculated to prevent their being accurately observed. The consequence also of the violence may occasion an injury to the mind and an indistinctness of memory as to the particular transaction. The deceased may have stated his inference from facts concerning which he may have drawn a wrong conclusion, or he may have omitted particulars, from not having his attention called to them. Such evidence is therefore liable to be incomplete. He may naturally also be disposed to give a partial account of the occurrence, although not possibly influenced by animosity or ill

will. From these considerations the law recognizes and declares that dying declarations shall be received and used as testimony with great caution." The court in charging the jury read 'them the sections of the code as to dying declarations. He further instructed them: "Dying declarations should be received and considered by the jury with great caution. If such declarations were made, it is your duty to consider all of the circumstances under which they were made, the mental and physical condition of the deceased at the time, whether the circumstances were calculated to impair his powers of observation and memory, whether the deceased stated a mere conclusion of his own mind or the facts of the case, whether his statement was full or only a partial one, and, after considering all the attending circumstances, determine for yourselves the credibility and weight of this part of the testimony. The jury may also consider, in regard to dying declarations, whether the account given by the deceased on the occasion was influenced by resentment, and therefore was biased and incomplete, or whether it was complete and unbiased. . . It is for you to determine, therefore, first, whether the evidence sufficiently shows that the deceased was conscious of his approaching death—that his death was really approaching, to authorize the admission of the dying declarations; and if not, you should disregard the dying declarations altogether. . . You are to determine what weight to give it," etc. These instructions being certainly as favorable to the accused as he could expect, it was not error for the court to decline a request to give a lengthy, argumentative charge on the subject of dying declarations, which set forth the reasoning of a writer on criminal evidence quoted in the opinion in the case of *Mitchell* v. *State*, 71 *Ga.* 128, delivered by a judge of this court, " why great caution is necessary not only in the admission, but in the use of this testimony." In *Campbell* v. *State,* 11 *Ga.* 353-375, it was said. " Great caution should be observed in the use of this kind of evidence." But this was before the adoption of the code dealing with the admissibility of dying declarations. It would seem that the codifiers, in prescribing the rule as to the admissibility of dying declarations in prosecutions for homicide, declaring that they are admissible only when made 'by a person in the article of death, when he is conscious of his condition, as well as restricting the use of such declarations to the sole

purpose of showing the cause of death and the person who committed the act, defined the precautionary rule which the decisions had pronounced, which should be observed in the admission of this kind of evidence. See *Mitchell* v. *State, 71 Ga.* 141. Having so instructed the jury, there was no error in refusing this request.

9. The fortieth ground of the motion relates to alleged newly discovered evidence as disclosed in an affidavit by Hermon Bussey, and the forty-first ground relates to alleged newly discovered evidence as set forth in an affidavit by Irene Jones. An examination of the affidavits discloses that the alleged newly discovered evidence merely tended to impeach witnesses who had testified in behalf of the State; and therefore it did not show cause for the grant of a new trial. The forty-second ground relates to the alleged newly discovered evidence of Virginia Reynolds. Her affidavit amounts to evidence merely cumulative of the statement of the accused, except that she states that the deceased had his hand on his right hip-pocket, with the other hand reaching toward the accused, and that the deceased had one foot on the step of the store when the accused first fired. The character and credibility of Virginia Reynolds is vouched for by one affidavit only, that of Ellen Schley, who deposes that the associates of Virginia Reynolds were Emma Peterson, William Peterson, and the deponent. On the hearing of the motion for a new trial the State submitted affidavits of numerous witnesses, whose respective characters were sustained by affidavits of other witnesses, to the effect that Virginia Reynolds was a negro prostitute, of bad character, and unworthy of belief, and that they would not believe her on oath; and that Ellen Schley, who made the affidavit as to the good character of Virginia Reynolds, was herself of bad character, and a prostitute, and unworthy of belief. This ground also is insufficient to require interference with the discretion of the trial judge in overruling the motion for a new trial.

10. The verdict was authorized by the evidence, and the discretion of the trial court in refusing a new trial will not be disturbed.

*Judgment affirmed. All the Justices concur, except Hill, J., not presiding.*